NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LINDA BULLARA-FARLEY, | : | |
| Plaintiff, | : | Civil Action No. 12-7081 |
| v. | : | **OPINION** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

**PISANO, District Judge:**

Presently before the Court is an appeal by Linda Bullara-Farley ("Plaintiff") from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her request for a Disability Insurance Benefits ("DIB"). The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g), and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court finds that the record contains substantial evidence supporting the Administrative Law Judge's ("ALJ") decision and therefore affirms the final decision of the Commissioner.

**I. PROCEDURAL HISTORY**

Plaintiff submitted an application for DIB on March 26, 2008, alleging disability from October 15, 2005, through her date last insured of December 31, 2010, due to severe neurological, orthopedic conditions, and obesity. Complaint ("Compl.") at ¶¶ 4, 5, 6; Tr. 18. The Commissioner denied her claims both initially and on reconsideration. Compl. at ¶ 8. Upon Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ"). Compl. at ¶

8. On April 14, 2011, the ALJ issued a written decision denying Plaintiff's claim. Tr. 18. Plaintiff requested that the Appeals Council review of the ALJ's decision; on September 19, 2012, the Appeals Council affirmed the ALJ's denial and the ALJ's decision became the final decision of the Commissioner. Compl. at ¶ 8. Subsequently, Plaintiff appealed the decision to this Court.

## II. BACKGROUND

Plaintiff was born on July 20, 1971, and has completed two years of community college. Tr. 98. She lives with her husband, her mother, and her two children, who were born in 2005 and 2007. Tr. 33, 227. Plaintiff worked as a licensed insurance broker for sixteen years, and managed a staff of one to two. Tr. 31, 98, 117. According to Plaintiff, her brokerage license has expired and she is consequently currently unable to work an insurance broker. Tr. 32. Plaintiff indicated that in this position she prepared insurance quotes for clients, which required her to spend most of her time at her desk meeting in-person or talking on the phone with clients. Tr. 207. She further specified that the job required her to: walk for 1.5 hours a day; stand for 1 hour a day; sit for 5.5 hours a day; handle, grab or grasp big objects for 4 hours a day, reach for 4 hours a day; and write, type or handle small objects for 4 hours a day. Tr. 208. She did not have to climb, stoop, kneel, crouch, or crawl in this position. Tr. 18. According to Plaintiff, she frequently lifted weight less than ten pounds, and never lifted weight heavier than twenty pounds. Tr. 208.

Plaintiff indicated that she has experienced back pain since she was nine years old, and had her first surgery when she was fourteen years old, in 1985. Tr. 31. In 2008, shortly after Plaintiff gave birth to her second child, Plaintiff's back pain flared up and she started visiting doctors to address her symptoms, prior to having a second surgery in March 2008. Tr. 103. On

January 28, 2008, Plaintiff had three x-rays; the x-ray of the lumbosacral spine showed narrowing of the disc space at the level of L5-S1 and L3-L4, status-post laminectomy at the level of L5 and congenital malformation at the lateral aspect of L5 and the sacrum consistent with bilateral sacralization.  Tr. 293.  Examination of the sacroiliac joints shows bilateral sacroiliac sclerosis and suggests chronic diastasis.  Tr. 293.  An x-ray of the thoracic spine showed normal results.  Tr. 294.  Last, an x-ray of the cervical spine showed a normal cervical spine.  Tr. 295.  Soon after, on February 4, 2008, Plaintiff had an MRI of her lumbosacral spine, which showed: grade II anterior spondyloisthesis at L5-S1; slight to mild compression in the ventral aspect of the thecal sac by the postero-superior aspect of the body of S1; a diffuse annular bulge and related osteophytic ridge transversing the interspinous space at the L4-L5 disc space level; degenerative disc disease at the L2-L3 disc space level, together with facet and ligamentum flavum hypertrophy, producing a moderate to severe lumber stenosis at the L2-L3 disc space level.

In 2008, Plaintiff began seeing Dr. Sean McCance at Lenox Hill Hospital for her condition.  Tr. 349.  There, on February 12, 2008, she was examined for scoliosis and was diagnosed with mild dextroscoliosis at T6 and anterolisthesis at L5-S1.  Tr. 349.  On February 21, 2008, Plaintiff had a CT scan of the lumbar spine, which indicated lumbar stenosis.  The scan showed: exuberant posterior bony fusion mass at L3-S1; calcified central disc protrusion with posterior hypertrophic change, causing severe canal stenosis at L2-L3; L5 vertebral body displacement anteriorly and inferiorly in comparison to S1; heterogeneous 1.6 cm lesion within the right kidney.  Tr. 352.

On March 10, 2008, Plaintiff went into surgery again and had a lumbar fusion to address back pain, leg pain, and spinal imbalance.  Tr. 311, 370.  There were no complications during the

procedure, which included posterior lumbar interbody fusion (PLIF), transforaminal lumbar interbody fusion (TLIF), laminectomy, and fusion with iliac crest bone graft (ICBG) and instrumentation above L4-S1.  Tr. 309.  Following the surgery, Plaintiff went to see Dr. McCance on March 25, 2008, for a follow-up appointment.  Tr. 370.  Dr. McCance indicated that "[o]verall, [Plaintiff] is recovering well from her lumbar surgery."  Tr. 370.  Furthermore, while Plaintiff continued to complain of some numbness and paresthesias in the lateral thighs and bilateral buttocks, "[s]he states her standing posture is better, and she feels straighter . . . .  She denies any lower extremity weakness and states she is able to ambulate inside for about 20 minutes and sit and stand for 20 minutes."  Tr. 370.  Upon examination, Dr. McCance stated that she showed a normal gait pattern and that her "lumbar active range of motion is within functional limits;" furthermore, her bilateral extremity motor and neurologic exam were normal.  Tr. 370.

A March 14, 2008, CT pulmonary angiogram did not show any central filling defects from the main pulmonary outflow tract to the proximal lobar branches.  Tr. 322.  A March 14, 2008, test of the anteroposterior and lateral spine showed accentuated lumbar lordosis and osteitis condensans ilii.  Tr. 322.  In a General Medical Report from May 1, 2008, Dr. McCance wrote that Plaintiff was "[d]oing well but totally disabled at this time."  Tr. 367.  When asked about Plaintiff's ability to do work related activities, Dr. McCance stated that Plaintiff could: lift and carry 10 pounds or less, stand and/or walk less than 1 hour, sit for 1 hour, and push and/or pull 10 pounds or less, with no other limitations.  Tr. 368.

Progress Notes from Upper East Side Medicine, P.C. from April 17, 2008, through April 29, 2009, indicate that Plaintiff was being prescribed pain medication despite feeling better since the fusion surgery, due to mild back pain, burning pain in the thighs, and numbness, among other symptoms.  Tr. 384-89.  On May 5, 2008, Dr. McCance stated in an Office Notes that Plaintiff

4

was overall "coming along nicely," with improved posture, strengthening legs, minimal pre-operative spine pain, and no pre-operative left leg numbness and pain, despite some left thigh symptoms when walking long distances such as numbing and burning. Tr. 362. He further described Plaintiff's ability to sit comfortably, sleep comfortably, stand in good balance, walk with a normal gait, and use good posture. Tr. 362. Dr. McCance's opinions were supported by testing done the same day. While an x-ray to evaluate scoliosis showed a mild dextrocurvature to the thoracic spine with the apex at T6 and exaggeration of the normal lumbar lordosis indicating scoliosis, it also showed postoperative changes of the lower spine, no compression fracture and no spondylolisthesis. Tr. 347. Similarly, an x-ray of the lumbosacral spine showed that hardware and alignment were in adequate position and no spondylolisthesis fracture, although there were laminectomy defects and sclerosis at the SI joints bilaterally. Tr. 348. Subsequently, Dr. McCance referred Plaintiff to Dr. Carasca for a neurological examination, which was performed on May 20, 2008, and revealed mild decreased sensation over the S1 dermatomes with slightly depressed ankle DTR's, but otherwise unremarkable results. Tr. 324.

Examinations from June 6, 2008, showed similar results. A scoliosis x-ray indicated laminectomy defects and what seemed to be anterior placement of L5 on S1. Tr. 346. A spinal x-ray showed no changes in the exaggeration of the lumbar lordosis, and no acute fracture, dislocation or subluxation. Tr. 345. Dr. McCance wrote again on Plaintiff's conditions on August 5, 2008, explaining again that Plaintiff was overall recovering well from surgery. Tr. 360. Dr. McCance wrote that Plaintiff herself stated that: she felt stronger, straighter, and more stable in her back; her thoracic pain was a 3/10 during the day but could reach 9/10 at night and in the mornings; she was taking Percocet and Ultram for pain control; she still had some numbness in her left thigh, but it was 10% better than before; she did not have paresthesias or

5

weakness in bilateral lower extremities; she was able to ambulate for thirty minutes to one hour with some thigh burning symptoms, stand for thirty minutes, and sit for thirty minutes. Tr. 360. Dr. McCance's physical examination showed that Plaintiff had a normal gait pattern, normal bilateral lower extremity motor and neurologic exam, and normal limit of all planes in lumbar active range of motion. Tr. 360.

On October 16, 2008, Dr. McCance filled out a Passive Range of Motion Chart regarding Plaintiff for the New Jersey Division of Disability Determination Service. Tr. 357-59. He indicated that Plaintiff was walking at a reasonable pace, that she was not using a handheld assistive device, and that her muscle weakness was normal in both legs, but that she had some sensory loss in her left thigh, had difficulty with bending, lifting, twisting activities. Tr. 358-59. Soon after, on October 28, 2008, Dr. McCance reported in an Office Note that Plaintiff was able to walk about a block, stand for about a half-hour, sit for up to an hour, stand straight and independently, and walk with a normal gait pattern. Tr. 356. However, he also noted that Plaintiff was having more difficulty walking at that time and had residual numbness in her left thigh. Tr. 356. Overall, Dr. McCance stated, "Linda had been doing quite well, but appears to be having a setback." Tr. 356.

On October 30, 2008, Dr. Robert Walsh, a State Agency medical consultant, reviewed the record to determine Plaintiff's Residual Functional Capacity (sometimes referred to herein as "RFC"). Tr. 328-35. He found that Plaintiff could: occasionally lift ten pounds; frequently lift less than ten pounds; stand and/or walk for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull with all extremities. Tr. 329. Dr. Walsh indicated that RFC is sedentary, and supported these conclusions with the following facts: strength was 5/5 in legs, reflexes were normal, sensation

was diminished left thigh, heel and toe and gait was normal. Tr. 329. He further stated that Plaintiff could: climb ramps and stairs occasionally; climb ladders, ropes, and scaffolds never; balance occasionally, stoop occasionally; kneeling occasionally; crouch never; crawl never. Tr. 330. Moreover, Plaintiff had no manipulative, visual, communicative, or environmental limitations. Tr. 330. As a result, Dr. Walsh concluded that the severity of Plaintiff's reported symptoms was not proportionate to the medical evidence of record, and the ultimate effect of the symptoms on function was not consistent with the medical evidence of record. Tr. 333. A DDS Disability Worksheet note from October 30, 2008, explained that after the orthopedic review, Plaintiff's claim was denied, given that the strength in her legs was 5/5 and her reflexes, heel/toe/gait were normal. Tr. 327. Although she had diminished sensation in her left thigh, she was able to return to her past sedentary work as an office manager. Tr. 327.

   Plaintiff was again seen at Lenox Hill hospital for testing on November 3, 2008. Tr. 336-42. A scoliosis x-ray showed preservation of thoracic and lumbar vertebral body heights, no vertebral segmentation anomalies, slight pelvic tilt, and bilateral sacroilitis. Tr. 336. A lumbosacral spine x-ray showed decreased bony mineralization, no scoliosis, no lumbar vertebral compression fractures, intact hardware, disc space narrowing at L4-L5, grade 2 anterior spondylolisthesis of L5 and S1, no instability, and bilateral sacroilitis. Tr. 336. A thoracic spine CT showed intact and well-positioned hardware, bilateral sacroilitis, and a heterogeneous lesion in the right kidney containing few course calcifications. Tr. 338. A lumbar spine CT showed similar results to the thoracic spine CT, with the addition of a small fluid collection posterior to the posterior elements of the lumbar spine. Tr. 339. An MRI of the thoracic spine showed multiple small disk protrusions and minimal indentation of the ventral spinal cord at T4-5, T5-6, T6-7. Tr. 341. An MRI of the lumbar spine showed fluid collection posterior to the posterior

elements from T12 inferiorly to the L3 level, no evidence of abnormal epidural enhancement or collection, and no evidence of thecal sac compression or foraminal stenosis. Tr. 342.

On January 26, 2009, Plaintiff returned to Dr. McCance complaining of worsening back pain. Tr. 375. On February 13, 2009, Dr. McCance filled out another Passive Range of Motion Chart regarding Plaintiff for the New Jersey Division of Disability Determination Service. Tr. 354-55. His impressions did not change from those he stated on October 16, 2008. Tr. 357-59. Plaintiff was walking at a reasonable pace and not using a handheld assistive device, her muscle weakness was normal in both legs, but she had some sensory loss in her left thigh, and she was advised to avoid excessive bending, lifting, twisting activities. Tr. 354-55. A DDS Disability Worksheet detailed Plaintiff's 2009 medical narrative, and concluded on June 23, 2009, that Plaintiff had an orthopedic impairment in a case rated by a DDS doctor, and the prior RFS of "03S" was thus affirmed. Tr. 375. It further states that Plaintiff is able to return to her prior relevant work ("PRW") as an insurance company Office Manager, which is considered sedentary work with a specific vocational preparation ("SVP") of 8, and thus the claim was denied. Tr. 375.

In 2009, Plaintiff received several injections to address her symptoms. On April 29, 2009, Plaintiff received the first flouro-guided bilateral sacro-iliac joint injection for bilateral buttock pain in a three-part series of injections. Tr. 383. On May 28, 2009, and June 26, 2009, she received the second injection and third injections, accordingly. Tr. 381-82. On October 29, 2009, Plaintiff received a trigger point injection with local anesthetic and steroid for neck pain, and a flouro-guided bilateral sacro-iliac joint injection for bilateral buttock pain. Tr. 378-79. This was followed by an additional flouro-guided bilateral sacro-iliac joint injection for bilateral

buttock pain on December 3, 2009.  Tr. 377.  No complications were noted with any of these injections.  Tr. 377-79, 81-83.

In a September 24, 2010, Residual Functional Capacity Form, Dr. McCance detailed Plaintiff's chronic back pain and decreased lumbar range of motion, as well as her ability to: lift and carry a ten to fifteen-pound maximum, walk only two blocks, stand and walk without interruption for less than one hour, sit without interruption for thirty minutes, climb stairs frequently, balance occasionally, stoop occasionally, crouch never, kneel never, crawl never, and push or pull only ten pounds.  Tr. 390-93.

Dr. McCance gives an overall perspective of Plaintiff's medical history in a final Office Note dated September 24, 2010.  Tr. 394.  She was seen for an initial evaluation on February 12, 2008, with complaints of "increased low back pain that radiated down into both legs with numbness and tingling."  Tr. 394.  She underwent extensive testing and ultimately underwent surgery on March 10, 2008, from which she recovered well, with decreased pain and better overall posture.  Tr. 394.  On October 28, 2008, Plaintiff returned to Dr. McCance with a "flare-up of symptoms after doing increased activities and picking up her ten-month-old child."  Tr. 395.  Studies showed no acute lesions, well-healed fusion, intact alignment of instrumentation, and no infection.  On April 3, 2009, Plaintiff returned to the office again "with persistent complaints of bilateral buttock and SI pain that was 10/10 with flare-ups," but x-rays showed excellent alignment and healed fusion.  Tr. 395.  In response to these flare-ups, Plaintiff received SI joint injections, and on August 13, 2009, she was seen for a three-phase bone scan with SPECT CT "which demonstrated very inflamed and abnormal SI joints which seemed to be the majority of her problem."  Tr. 395.  Plaintiff indicated that her pain was persisting in a follow-up visit, and she was advised that she could consider sacroiliac joint fusion, which she rejected at

9

the time. Tr. 395. Finally, Dr. McCance summarized that she was initially doing well after her 2008 surgery, but "over the years has developed persistent and chronic back pain and SI joint inflammation. Up to this day, her symptoms are persistent and she is limited by her pain syndrome. . . . She has tried multiple conservative measures such as physical therapy, injections, and medications. She has difficulty ambulating, standing, or sitting for length of time. She is only able to ambulate a few blocks, stand for 15 minutes, and sit for 30 minutes. [Plaintiff] is limited by her symptoms and should avoid any excessive bending, twisting, or heavy lifting greater than 10-15 pounds. At this point, she needs to continue with conservative measures for chronic pain control." Tr. 395.

### III. STANDARD OF REVIEW

A reviewing court must uphold the final decision of the Commissioner if it is supported by "substantial evidence." 42 U.S.C. § 405(g); 1383(c)(3); *Morales v. Apfel*, 225 F.3d 310, 316 (3d. Cir. 2000). In order for evidence to be "substantial," it must be more than a "mere scintilla," *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938), but may be slightly less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988). The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's decision was reasonable given the record before him. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

The reviewing court must review the evidence in its entirety. *Daring v. Heckler*, 727 F.2d 64, 70 (3d. Cir. 1984). As part of this review, the court "must take into account whatever in the record fairly detracts from its weight." *Schoenwolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Willibanks v. Sec'y of Health and Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has an obligation to facilitate the court's review: when the

record shows conflicting evidence, the Commissioner must explain clearly his or her reasons for rejecting or discrediting competent evidence. *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986). Additionally, the reviewing court is not empowered to weigh the evidence or substitute its conclusions for those of the fact finder. *See Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984).

### A. Establishing Disability

In order to be eligible for DIB benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423 (d)(1)(A). The statute also requires that an individual will be determined to be under a disability only if his or her physical and mental impairments are "of such severity that he [or she] is not only unable to do his [or her] previous work, but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).

Social Security regulations detail a five (5)-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. If a finding of disability or non-disability can be made at any point in the sequential analysis, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must determine whether the claimant has engaged in any substantial gainful activity since the onset of the alleged disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant has not engaged in any substantial gainful activity, then the Commissioner must consider whether the claimant has a "severe impairment" or "combination of impairments" which significantly limits his or her physical or mental ability to

11

do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). The claimant bears the burden of establishing the first two requirements of the evaluation, and failure to satisfy either automatically results in a denial of benefits. *Bowen v. Yuckert,* 482 U.S. 137, 146-47 n.5 (1987).

Third, if the claimant satisfies the first two steps, then he or she must provide evidence that his or her impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing of Impairments"). 20 C.F.R. § 404.1520(d). Upon such a showing, he or she is presumed to be disabled and is automatically entitled to disability benefits. *Id.* If the claimant does not have a listed impairment, the Commissioner will evaluate and make a finding about the claimant's Residual Functioning Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4), (e).

Fourth, the Commissioner must determine whether the claimant's RFC permits him or her to perform past relevant work. 20 C.F.R. § 404.1520(e). A claimant's RFC is defined as "the most [an individual] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545. If the claimant is found to be capable of returning to his or her previous line of work, then he or she is not disabled and therefore not entitled to disability benefits. 20 C.F.R. § 404.1520(e)-(f).

Fifth, if the claimant is unable to perform the work of his or her previous job, the Commissioner must consider the RFC along with the claimant's age, education, and past work experience to determine if he or she can do other work in the national economy. 20 C.F.R. § 404.1520(g). The burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work. 20 C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant is entitled to and will receive Social Security benefits. *Yuckert,* 482 U.S. at 146-47 n.5.

**B. Objective Medical Evidence**

Under Title II of the Social Security Act, a claimant is required to provide objective medical evidence in order to prove his or her disability. 42 U.S.C. § 423(d)(5)(A). Moreover, a claimant cannot prove that he or she is disabled based exclusively on subjective symptoms. *Green v. Schweiker,* 749 F.2d 1066, 1069-70 (3d. Cir. 1984). Subjective complaints of pain, without more, do not in themselves constitute disability. *Id.* at 1069-79. In order for the claimant to be awarded benefits, he or she must provide medical findings to prove that he or she has a medically determinable impairment. 42 U.S.C. § 423(d)(1)(A).

### IV. THE ALJ'S DECISION

On April 8, 2011, a hearing was held before an ALJ in Newark, New Jersey. Plaintiff testified at the hearing. Tr. 26. In a written opinion dated April 14, 2011, the ALJ denied Plaintiff's claim for DIB, concluding that Plaintiff was not disabled (as defined under the relevant provisions) at any time from October 14, 2005, the alleged onset date, through December 31, 2010, the date last insured. Tr. 22.

After analyzing the evidence in the record, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 18. The ALJ then proceeded to the five-step sequential analysis pursuant to 20 C.F.R. § 404.1520. Tr. 18-22. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 15, 2005, through her date last insured of December 31, 2010. Tr. 18. At step two, the ALJ determined that through December 31, 2010, Plaintiff did have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months, and thus had a severe impairment or combination of impairments. Tr. 18. Her severe impairments

included: status post spinal fusion surgery, chronic back pain, chronic bilateral sacroilitis, and obesity.  Tr. 18.

At step three, the ALJ determined that through December 31, 2010, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.  The ALJ noted that although Plaintiff had severe impairments, they were not supported by specific clinical signs and diagnostic findings that are required to meet or equal the requirements identified in the listing of impairments.  Tr. 18.  In his analysis, the ALJ noted that he evaluated obesity pursuant to SSR 02-01p guidelines, which state: "However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record."  SSR 02-01p; Tr. 19.

The ALJ next determined that through December 31, 2010, Plaintiff had the residual functioning capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a), although Plaintiff "cannot climb any ladders, ropes or scaffolds, crouch, kneel or crawling, and can perform other postural functions only occasionally," and cannot "sit for more than 30 minutes consecutively or stand for more than 15 minutes consecutively without having to change postures," and "must avoid hazards and vibrations."  Tr. 19.  Therefore, the ALJ concluded, through December 31, 2010, Plaintiff was capable of performing past relevant work as an office manager, and was thus not under a disability as defined by the Social Security Act.  Tr. 48.  20 C.F.R. 404.1520(c).  Tr. 22.

In performing this analysis, the ALJ stated that he considered all symptoms and all opinion evidence. Tr. 19. In considering the Plaintiff's symptoms, the ALJ followed the required two-step process. Tr. 19. First, the ALJ evaluated whether there were medically determinable physical or mental impairments that could reasonably be expected to cause the Plaintiff's pain or other symptoms. Tr. 19. Here, the ALJ found that the Plaintiff's medically determinable impairments of status post spinal fusion surgery, chronic back pain, chronic bilateral sacroilitis, and obesity could reasonably be expected to cause the Plaintiff's pain or other symptoms. Tr. 20.

Second, the ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms. Tr. 19. Here, the ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the determined residual functional capacity assessment. Tr. 20. In reaching this conclusion, the ALJ considered at length Plaintiff's medical record, and concluded that objective evidence does not support Plaintiff's testimony of inability to work and deficiencies in concentration. Tr. 20-22. Moreover, the ALJ notes that no doctor has reported that Plaintiff is disabled or unable to work, and although she suffers some limitations from her impairments and her capacity to perform work is affected, she retains the residual functional capacity to perform sedentary work with some limitations. Tr. 21-22.

**V. DISCUSSION**

On appeal, Plaintiff contends that the ALJ erred in two ways. First, Plaintiff argues that the ALJ erred in step three by finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. In particular, Plaintiff argues that the ALJ failed to combine all of

Plaintiff's severe impairments in comparing Plaintiff's impairments against the listed impairments set forth in 20 CFR Part 404, Subpart P, Appendix 1.  However, the ALJ explicitly stated that he did just that, finding, "the claimant did not have an impairment or *combination* of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Tr. 18 (emphasis added).  The ALJ thus stated that he considered the impairments in combination, and Plaintiff points to no reason to believe he did not do so.

Moreover, substantial evidence of record supports the ALJ's determination at step three. As the Commissioner notes, to satisfy the relevant listing 1.04C, Plaintiff was required to demonstrate lumbar spinal stenosis, resulting in pseudoclaudication, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively.  *See* Plaintiff's Brief at 21 (pointing to Listing 1.04C as the relevant listing).  For Plaintiff to show that her impairment meets this listing, the impairment must meet all of the specified medical criteria of the listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Id.*

While, as Plaintiff points out, certain of the medical criteria of Listing 1.04C may have been met, Plaintiff did not show that all of the required elements the listing were consistently present throughout the relevant time period.  As noted below, for example, medical records show that Plaintiff often had no signs of neurological weakness and was able to ambulate normally.

In considering the relevant listing criteria, the ALJ discussed the findings of Dr. Andrei Carasca, a neurologist, who examined Plaintiff on May 20, 2008, following her March 2008 spinal fusion surgery. Tr. 20, 324.  As the ALJ explained, electromyography revealed only mild lumbosacral stenosis. *Id.*  A neurological examination on that date revealed only slightly depressed ankle reflexes, and was otherwise unremarkable, without evidence of weakness. *Id.*

16

The ALJ also considered the treatment notes of Plaintiff's orthopedist, Dr. Sean McCance. Tr. 20-21. When Plaintiff saw Dr. McCance on February 12, 2008, before her lumbar fusion surgery, a neurological examination was normal for all motor, sensory, and reflex findings. Tr. 372. Plaintiff was able to rotate her hips without pain and although her posture was stooped forward and she experienced pain with lumbar extension, her gait pattern was normal, and heel and toe-walking remained intact. *Id.*

When Plaintiff again visited Dr. McCance on March 25, 2008, just after posterior lumbar fusion surgery, she ambulated normally. Tr. 370. Plaintiff demonstrated a normal gait pattern, as well as lumbar active range of motion within functional limits. *Id.* Motor and neurologic examinations of Plaintiff's legs were normal, and a straight leg raising test was negative. *Id.*

Likewise, on May 6, 2008, it was noted that Plaintiff stood with good balance and once again walked with a normal gait. Tr. 362. Plaintiff's posture was "quite good," and she was able to do heel and toe-walking. *Id.* A neurological examination revealed normal knee and ankle reflexes. *Id.* Plaintiff's sensation was generally intact, but she did have decreased sensation to light touch in the left thigh. Id. Her SLR was negative. *Id.* She exhibited no weakness, as power testing was normal (5/5) throughout Plaintiff's legs. *Id.*

Dr. McCance's records dated August 5, 2008 and October 28, 2008 similarly indicate that plaintiff walked with a normal gait, SLR was negative, and motor and neurologic examinations of Plaintiff's legs were normal. Tr. 360.

Further, to the extent that Plaintiff argues that the ALJ did not appropriately account for Plaintiff's obesity, the Court finds such an argument to be without merit. The ALJ acknowledged that increase the severity or functional limitations of another impairment, Tr. 19, and expressly stated that he specifically considered Plaintiff's obesity with respect to the listings.

17

Plaintiff points to nothing in the medical evidence that suggests actual limitations associated with Plaintiff's weight. Consequently, and in light of the evidence outlined above, the Court finds that the substantial evidence supports the ALJ's finding at step three.

Plaintiff next argues that substantial evidence does not support the ALJ's RFC determination and that the ALJ did not properly consider Plaintiff's subjective complaints of pain. Turning first to the ALJ's consideration of Plaintiff's complaints of pain, the Court finds that the substantial evidence supports the ALJ's conclusion that Plaintiff's allegations with respect to the intensity, persistence, and limiting effects of her symptoms were not entirely credible to extent alleged.

Standing alone, a claimant's subjective statement as to pain or other symptoms are not conclusive evidence of disability; there must be evidence of the existence of a medical condition that reasonably could be expected to produce the symptoms alleged that, considered with all the evidence, demonstrates that Plaintiff is disabled. 20 C.F.R. § 404.1529(b); SSR 96-7p. Here, because the symptoms alleged suggested greater functional restriction than was demonstrated by objective medical evidence alone, the ALJ considered other evidence, such as Plaintiff's daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, medication, and treatment. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. In considering Plaintiff's activities of daily living, the ALJ noted that Plaintiff was performing sedentary activities of daily living. 20 C.F.R. § 404.1529(c)(3)(i); Tr. 21. For example, Plaintiff prepared meals, showered and dressed independently, helped to dress her children, and she sat with her children for much of the day, to read, watch television and movies, and do other indoor activities. Tr. 227, 230.

Further, the ALJ noted that Plaintiff stated that did not always take her pain medication, which, notwithstanding Plaintiff's assertion that she have developed a high tolerance for pain,

18

supports that ALJ's finding that that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not fully credible.

Similarly, substantial evidence supports that ALJ's RFC determination that Plaintiff had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) with the exception that she cannot climb ladders, ropes, or scaffolds, she cannot crouch, kneel or crawl, can perform other postural functions only occasionally, must avoid hazards and vibrations and, further, that Plaintiff cannot sit for more than 30 minutes consecutively or stand for more than 15 minutes consecutively without having to change postures.  In particular, there are the records of Plaintiff's treating physician, Dr. McCance.  In addition to the medical findings discussed above, the ALJ also noted that September 24, 2010, Dr. McCance completed a Residual Functional Capacity Form in which he stated that Plaintiff could lift and carry 10-to-15 pounds, that she could stand and walk, without interruption, for less than an hour, and that she could stand for 15 minutes at a time. Tr. 21, 391.  Dr. McCance indicated no limitation as to the total number of hours that Plaintiff could stand and walk during an 8-hour workday.  *Id.*  Dr. McCance similarly stated that Plaintiff could sit without interruption for 30 minutes at a time, and again indicated no limitation as to the total number of hours that she could sit throughout the workday.  *Id.*  He stated that Plaintiff could frequently climb stairs, could occasionally balance and stoop, could never crouch, kneel, or crawl, and should avoid moving machinery.  *Id.*  The ALJ incorporated many of these limitations into his RFC determination.

The ALJ also considered the October 30, 2008 the opinion of the state agency's medical consultant Dr. Robert Walsh, who, based upon his review of the record found that Plaintiff retained the ability to perform the demands consistent with sedentary work. Tr. 21, 329-32.  Dr. Walsh opined that Plaintiff could lift and carry 10 pounds occasionally and less than 10 pounds

19

frequently, sit for about 6 hours in an 8-hour workday, and stand and walk for about 2 hours in an 8-hour workday. Tr. 329. He found that Plaintiff had an unlimited ability to push and pull, and could occasionally climb ramps and stairs, balance, stoop, and kneel.  Tr. 330. The ALJ incorporated certain of these conclusions into his RFC findings.

Overall, based on a careful review of the record, the Court finds that substantial evidence supports the ALJ's decision in this case.  The decision of the Commissioner, therefore, is affirmed.

## VI. CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the ALJ's decision denying Plaintiff disability insurance benefits.  The Court affirms the final decision of the Commissioner.  An appropriate Order accompanies this Opinion.


Dated: October 31, 2014                              /s/ Joel A. Pisano
                                                     JOEL A. PISANO
                                                     United States District Judge